UNITED STATES of America, Plaintiff,

v.

Laurence John LAYTON, Defendant.

No. CR–80–0416 RFP.

United States District Court,
N. D. California.

April 6, 1981.

515

G. William Hunter, U. S. Atty., Stanford
Svetcov, Robert L. Dondero, Asst. U. S.
Attys., San Francisco, Cal., for plaintiff U.
S.

James F. Hewitt, Federal Public Defender, Frank O. Bell, Jr., Chief Asst. Federal Public Defender, Tony Tamburello, San Francisco, Cal., for defendant Laurence John Layton.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

Laurence Layton has been indicted on four criminal counts arising from the events which occurred at the Port Kaituma airport in the nation of Guyana on November 18, 1978. Those events resulted in the death of Congressman Leo J. Ryan, then a member of the United States House of Representatives from the 11th Congressional District of California, and the wounding of Richard Dwyer, the Deputy Chief of Mission for the United States in the Republic of Guyana. Congressman Ryan had traveled to Guyana for the purpose of investigating certain allegations that had risen concerning the Peoples Temple settlement in Jonestown. Mr. Layton had lived in Jonestown for the few months preceding the events in question here. The indictment charges Mr. Layton with (1) conspiracy to murder a Congressman, under 18 U.S.C. § 351(d); (2) aiding and abetting in the murder of a Congressman, under 18 U.S.C. §§ 351(a), 2; (3) conspiracy to murder an internationally protected person, under 18 U.S.C. § 1117; and (4) aiding and abetting in the attempted murder of an internationally protected person, under 18 U.S.C. §§ 1116(a), 2.

The defendant has moved, under Federal Rule of Criminal Procedure 17, for the issuance of subpoenas duces tecum to the F.C.C., the Department of State, and the House Foreign Relations Committee. For the reasons set forth below, we find that defendant has not established "good cause" within the meaning of rule 17(c) to order production of some of the material it requests, although good cause is established with respect to the remainder of the material. Accordingly, this court orders that the subpoenas be issued as modified.

*Bowman Dairy Co. v. United States,* 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed.

879 (1951), observed two fundamental characteristics of a rule 17(c) subpoena. First, rule 17(c) is not a discovery device. *Id.* at 220, 71 S.Ct. at 678. Second, its chief innovation was to provide a time before trial for the inspection of documents, not to expand the scope of rule 16. *Id.* at 220 n.5, 71 S.Ct. at 678 n.5. Most of the cases following *Bowman* have adopted the formula set forth in *U. S. v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y.1952), for determining whether the requisite showing of good cause has been made. That test requires the moving party to show: (1) that the documents sought are evidentiary and relevant; (2) that they are not otherwise procurable in advance of trial by the exercise of due diligence; (3) that the movant cannot properly prepare for trial without such production; and (4) that the application is made in good faith, and not as a general "fishing expedition."

As explained by the United States Supreme Court in *U. S. v. Nixon,* 418 U.S. 683, 700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974), application of this standard means that the movant "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." The Court also noted that where, as in the case of one of the subpoenas sought here, the subpoena is directed to a coordinate branch of government, the court should be "particularly meticulous to ensure that the standards of rule 17(c) have been correctly applied." *Id.* at 702, 94 S.Ct. at 3104. The subpoena must represent a "good faith effort to obtain identified evidence rather than a general 'fishing expedition.'" *U. S. v. Cuthbertson,* 630 F.2d 139 (3d Cir. 1980). The movant bears the burden of showing in what respect the documents sought are material to any issue in the case. A mere hope that the documents, if produced, may contain evidence favorable to the defendant's case will not suffice. *U. S. v. Bookie,* 299 F.2d 130 (7th Cir. 1956).

Some cases, it is true, define the rule 17(c) standard in fairly open-ended language, stating that "if the accused avers facts which, if true, would be relevant to any issue in the case, the request for sub-

poenas must be granted . . . ." *See, e. g., Welsh v. United States*, 404 F.2d 414, 417–18 (5th Cir. 1968); *U. S. v. Moudy*, 462 F.2d 694 (5th Cir. 1952); *U. S. v. Hathcock*, 441 F.2d 197, 199–200 (5th Cir. 1971); *Greenwell v. U. S.*, 317 F.2d 108, 113 (D.C.Cir. 1963). Examination of these cases, however, reveals that in each case the movant had made an extremely particularized showing of relevancy that would satisfy the standard set forth in *U. S. v. Nixon, supra*. In each case the movant "averred facts" which showed with a good deal of precision the substance of the material sought and the purpose for which it would be offered.

In the instant case, on the other hand, it is entirely unclear what bearing much of the material sought would have on the defendant's guilt or innocence. Defendant argues that he cannot know how the material would be relevant to his case until he has examined it. By this argument, defendant is, in effect, asking us to allow him to use rule 17 as a device to embark on a "fishing expedition." As explained above, however, rule 17 is not intended as a tool of discovery. Rather, a rule 17 subpoena presupposes that the movant has some minimum showing as to how the material sought would advance the movant's cause.

Applying these principles to the instant motions, we find that defendant has failed to make this threshhold showing with respect to much of the material which he seeks. We will discuss each of the subpoenas separately.

### I. *Subpoena to House of Representatives Committee on Foreign Affairs*

The House Committee on Foreign Affairs conducted an investigation into the assassination of Congressman Ryan and generally into the operations of the Peoples Temple. Two reports resulted from that inquiry, many sections of which are classified. There is little clue as to what most of these classified sections might contain or as to how they might advance defendant's case. Virtually all we have on which to base our assessment of possible relevance is the minimal description of each classified section which appears in the table of contents to the report. Some of these descriptions are quite uninformative, while others affirmatively suggest that the information contained in the deleted sections would be quite irrelevant to the instant case. For example, section II(A)(1) of the Report of the Staff Investigative Group to the Committee on Foreign Affairs, dated May 15, 1979 is described only as "The Investigation; A. Preparation." It is not clear how the investigative group's own preparation to make its investigation would have any relevance at all to Mr. Layton's defense. Similarly, sections III(J)(1) and (3) are titled "Social Security and foster children" and apparently concern an investigation into social security fraud which may have been occurring at the Peoples Temple. Defendant has not suggested any reason, nor can we imagine one, why the details of any such alleged fraud would be material to Mr. Layton's defense. We also cannot see how the findings as to the "Future status of the People's Temple" could in any way be helpful to Mr. Layton. Numerous other sections seem to concern the possible involvement of public officials of either Guyana or the United States with the activities of the Peoples Temple, or their knowledge of these activities before Congressman Ryan's death. Again, defendant has failed to make any showing as to how such involvement or knowledge would tend to exonerate Mr. Layton. (*See* sections III(C), (D), (H), (I).) Numerous other sections are labelled only as "Guyana Activities," "California Activities," or "Washington Activities." It is not clear whether these sections relate to the activities of the investigation committee in these areas, or to the activities of the Peoples Temple. If the latter, it is, of course, entirely unknown whether the activities relate in any way whatsoever to the events at the Port Kaituma airstrip. Yet another section is labelled "Conspiracy against Jim Jones and People's Temple?" Again, it is utterly unclear how a conspiracy *against* the Peoples Temple would have any bearing on this case.

In fact, the only section which, from its label, would appear to be relevant to this

case is section III(F), which is entitled "Conspiracy to Kill Leo Ryan?" Even here, it is unknown whether there will be any material in this section which will exonerate Mr. Layton. Keeping in mind, however, the great hardship that defendant is experiencing in obtaining evidence concerning the extent of his involvement in the events at the Port Kaituma airstrip, and the likelihood that this section will provide evidence on this point, we find that the defendant may subpoena section III(F) of the report. It should be noted, however, that our finding that defendant has made a threshold showing of relevance with respect to this section will not preclude reexamination of the question of relevance should this issue be raised upon a motion to quash the subpoena.

■ Defendant also seeks to subpoena from the House Committee on Foreign Affairs, certain classified portions of the record of Hearings before the Subcommittee on International Operations of the Committee on Foreign Affairs, dated February 20 and March 4, 1980. Defendant seeks a Customs Service Report referred to on page 17 of the transcript of the hearing, which would, according to the witness at the hearing, show that the State Department should have anticipated violence at Jonestown because the Peoples Temple had received a great many guns. We cannot see how the presence of guns in Jonestown, or the State Department's knowledge of those guns, would be relevant to Mr. Layton's defense. Defendant's other requests pertaining to the record of this hearing are even more imprecise. For example, defendant seeks production of "any testimony given during executive session with this subcommittee on February 20, 1980, by any person . . . ." This motion, we believe, is purely an attempt to obtain discovery and is not sanctioned by rule 17. Similarly, since there is no clue as to what her testimony would concern, defendant has failed to make a showing of good cause to compel production of the 86-page transcript of testimony of Claire Bouquet, a relative of a Jonestown resident. Finally, defendant seeks the response to the letter of the Honorable Clement J. Zablocki, Chairman of the House Foreign Affairs Committee, which is dated April 3, 1980. The response would apparently set forth the findings, if any, of the Permanent Select Committee on Intelligence as to possible CIA involvement in the events at Jonestown. There is absolutely no indication whether that committee ever made such findings nor, if so, how evidence of CIA involvement could possibly help to exculpate the defendant herein. Accordingly, the attempt to obtain these findings appears to be an impermissible "fishing expedition."

Therefore, it is ordered that the subpoena to the House Committee on Foreign Relations be issued as modified to compel production only of section III(F) of the Report of the Staff Investigative Group which is dated May 15, 1979.

## II. *Subpoena to Federal Communications Commission*

■ Defendant seeks to compel production of tapes of radio transmissions between the Peoples Temple Operations in Guyana and those in San Francisco. The F.C.C. allegedly monitored and taped some of these transmissions, and obtained tapes of other transmissions from ham radio operators. Defendant alleges that he believes many of these tapes concern Congressman Ryan's upcoming visit to the Jonestown settlement. If so, they would certainly be relevant to the question whether there was any preexisting conspiracy to kill Congressman Ryan. The tapes are likely to be admissible in evidence because it is likely that parties to most of the conversations are indicted or unindicted co-conspirators. *See U. S. v. Nixon, supra* 418 U.S. at 700, 94 S.Ct. at 3103. Therefore, we feel that defendant has made a preliminary showing of relevance and admissibility which permits issuance of the subpoena. We must reiterate, however, that if the nature of these tapes is more fully described in connection with a motion to quash the subpoena, it may become clear that some of tapes, at least, are not likely to contain relevant or admissible evidence. In that case, this

court will modify the subpoena to the extent necessary.

### III. *Subpoena to Department of State*

■ Defendant seeks 900 documents from the Department of State which might show its awareness of conditions in Guyana and of the danger to Congressman Ryan's party. Defendant has made no showing as to how such awareness, if proved, would be relevant to any issue in this case, and this court does not see how such information would tend to exculpate the defendant in any way. Therefore, the subpoena is denied in so far as it requests such information.

■ Defendant also requests State Department documents concerning conditions at the Jonestown settlement. Defendant asserts that the government has made conditions at the settlement relevant by charging that the alleged conspiracy to kill Congressman Ryan was motivated by the desire to conceal those conditions. While evidence concerning conditions at Jonestown may ultimately be relevant on the issue of the motivation for the alleged conspiracy, defendant has made no showing that any of the State Department information as to those conditions could be exculpatory. If conditions at Jonestown are relevant to this case at all, it will be on the issue of whether they motivated a "cover-up." Therefore, to be exculpatory, evidence of conditions would have to show that the conditions were salutary, or at least not so egregious as to have motivated a conspiracy to conceal them. Defendant has made no showing that there is any likelihood that the material concerning conditions which he seeks would provide such evidence. Therefore, to the extent that it would require production of such material, the subpoena must be denied.

■ Defendant also seeks all State Department documents concerning Peoples Temple activities from January 1, 1974 through November 20, 1978. This broad and open-ended request can only be viewed as an effort to obtain discovery. The request for all State Department documents regarding each of 26 individuals who are indicted and unindicted co-conspirators is similarly broad and open-ended, and must also be denied, except as it relates to Laurence Layton himself.

■ As to the request for material directly concerning the defendant, this court is troubled by the lack of any showing as to what might be contained in the material and whether it would be relevant and admissible. The same is true of the request for material concerning a conspiracy to assassinate Congressman Ryan or the Deputy Chief of Mission, Richard Dwyer. However, this court is mindful of the extreme difficulty of locating evidence of an alleged conspiracy in which most or all of the co-conspirators are dead. We believe that there is a substantial likelihood that some of the material directly related to the defendant will be enlightening as to the extent of Mr. Layton's personal involvement in the alleged conspiracy. Again noting that the question of relevance may be reexamined if a motion to quash is filed, we find that, as to material directly concerning Mr. Layton or a conspiracy to assassinate Congressman Ryan or the Deputy Chief of Mission, Richard Dwyer, defendant had made a minimum showing of relevance which supports issuance of a subpoena.

■ Finally, defendant requests that this court order production of State Department documents concerning American Embassy and consulate officer contacts with the defendant since November 18, 1980. In support of this request, defendant has submitted a declaration of Donald Hale which shows that embassy and consular officials visited Mr. Layton while he was in the Guyanese prison. Some of these visits occurred soon after the events at the Port Kaituma airstrip and at about the time when he made an inculpatory statement which the government intends to offer into evidence and which defendant has challenged as involuntary. This court finds that documents concerning embassy and consulate officer contacts with Mr. Layton are substantially likely to contain relevant

evidence of the defendant's mental state at or about the time of the offense charged and at or about the time of his allegedly involuntary confession. These documents may also contain evidence as to the allegedly coercive conditions in the prison where the defendant was being held and questioned. Therefore, we find that, as to these materials, defendant has made a threshold showing of relevance which supports issuance of the subpoena.

For the above reasons, this court denies defendant's motion for issuance of subpoenas and authorizes service of the modified subpoenas which are attached to this memorandum [not submitted for publication].

SO ORDERED.