884 F.2d 772
 In re GRAND JURY 87-3 SUBPOENA DUCES TECUM.
UNITED STATES of America, Plaintiff-Appellee,
v.
UNDER SEAL, Defendant-Appellant.
In re GRAND JURY 87-4 SUBPOENA DUCES TECUM.
UNITED STATES of America, Plaintiff-Appellee,
v.
UNDER SEAL, Defendant-Appellant.
 Nos. 88-5619, 88-5620.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 1, 1988.
Decided Aug. 31, 1989.
Rehearing and Rehearing In Banc Denied Dec. 12, 1989.
 
 Herald Price Fahringer (Lipsitz, Green, Fahringer, Roll, Schuller & James on brief); Ralph J. Schwarz, Jr., (Gerald F. Treanor, Jr., Venable, Baetjer & Howard on brief), for defendant-appellant.
 Bradford Russell Clark, Sp. Asst. U.S. Atty. (Henry E. Hudson, U.S. Atty., William G. Otis, Lawrence J. Leiser, Asst. U.S. Attys.; Janis Kockritz, Sp. Atty., Crim. Div., U.S. Dept. of Justice, on brief), for plaintiff-appellee.
 Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.
 ERVIN, Chief Judge:
 
 
 1
 These cases concern the question of whether subpoenas duces tecum which seek the production of certain corporate records as well as video tapes presumptively protected by the first amendment meet the relevancy, admissibility, specificity and necessity requirements of Fed.Rule Crim.Pro. 17(c). We affirm the district court's refusal to quash the subpoena issued to Model Magazine Distributors, requesting the company's corporate records. We find, however, that the government failed to demonstrate the relevance of either the corporate records requested from R. Enterprises, Inc. and MFR Court Street Books, Inc. or of the 193 named video tapes requested from Model Magazine. The government also failed to offer any evidence showing that the subpoena was a necessary tool for obtaining copies of the video tapes. For these reasons we reverse the district court's refusal to quash the subpoenas issued to R. Enterprises and MFR Court Street Books. We also remand the motion to quash the subpoena issued to Model Magazine requesting copies of the 193 video tapes, for further inquiry into both the relevancy of these tapes and the necessity of employing a subpoena duces tecum to obtain them.
 
 I.
 Factual and Procedural Background
 
 2
 These cases arise on a motion to stay a contempt order. The parties addressed the merits of the appeal in their briefs and oral arguments. We therefore decide the issues before us on the merits, rather than limiting our consideration to the request for a stay. Appeal of a civil contempt order is proper in this context. See United States v. Ryan, 402 U.S. 530, 532, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971); Cobbledick v. United States, 309 U.S. 323, 328, 60 S.Ct. 540, 542, 84 L.Ed. 783 (1940).
 
 
 3
 A party who chooses to subject himself to the risk of fines and imprisonment due to contempt can contest the validity of a subpoena in the role of contemner. If the subpoena is even partially bad, the contempt conviction should be reversed. See Bowman Dairy Co. v. United States, 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951).
 
 
 4
 The subpoena duces tecum at issue arose out of a federal grand jury investigation in Virginia concerning the distribution of obscene materials. Subpoenas duces tecum were originally served on Model Distributors and Metro Video Distributors in October, 1986. Those subpoenas requested certain corporate records, as well as "one copy of any video tape cassette, 8 mm film or 16 mm film" that depicted specified types of conduct, which would render the films legally obscene. The subpoenas also demanded documents related to any tapes involving the listed categories of sexual activity. Both Model and Metro Video refused to comply with the subpoenas arguing that they were "unreasonable and oppressive," in violation of Fed.R.Crim.Pro. 17(c). The district court denied the companies' motions to quash the subpoenas, and found both parties in contempt.
 
 
 5
 On appeal, this court reversed the district court's findings as to reasonableness and burdensomeness under Rule 17(c), and quashed the subpoenas. In re Grand Jury Subpoena: Subpoena Duces Tecum, 829 F.2d 1291 (4th Cir.1987), reh'g denied, 844 F.2d 202 (1988) ("Model I"). We found that the subpoenas did not meet the requirements of Rule 17(c) because:
 
 
 6
 The presumptively protected materials they seek are otherwise procurable, and in a less intrusive manner; the specificity of the subpoenas is illusory, since the categories described do not refer to particular tapes; as a result, the corporations before us would be required to perform burdensome searches and would be at risk for failing to fulfill vague requirements; in sum, the government appears to be engaging in a paradigmatic "fishing expedition."
 
 
 7
 829 F.2d at 1302.
 
 
 8
 Following our decision in Model I, the grand jury issued new subpoenas to Model, R. Enterprises[1], and MFR Court Street Books, Inc. on April 22, 1988. All three of these corporations are owned and operated by Martin E. Rothstein. When served with the subpoenas for these three corporations, Mr. Rothstein told an FBI agent that the entities were "all the same thing, I am the president of all three."
 
 
 9
 Model partially complied with the April 22 subpoena, but refused to produce "standard" corporate books and records (i.e. the general ledger, the disbursements journal, and banking records). The company based its refusal to comply fully on the grounds that it was no longer doing business in Virginia, and that the documents were not relative to a grand jury investigation in Virginia.
 
 
 10
 On June 2, 1988, the grand jury issued two new subpoenas to Model. The first again requested specific business records, and the second sought one copy of each of the 193 video cassettes Model had shipped to retailers in the Eastern District of Virginia. The 193 titles had been disclosed in Model's invoices supplied pursuant to the 1986 subpoena.
 
 
 11
 All three companies eventually moved to quash the various subpoenas. On June 17, 1988 the district court denied Model's motion to quash the subpoena requesting the 193 video tapes. The court found the subpoena satisfied the specificity standards suggested in Model I, and that the tapes were relevant to the government's investigation. The district court also denied Model's motion to quash the business records subpoenas issued to the company, and ordered the production of those records. The court found that those subpoenas were not overbroad.
 
 
 12
 On July 8, 1988 the district court denied R. Enterprises, Inc.'s motion to quash the records subpoena issued to it. The trial judge found that the subpoena was not overbroad, and that given Rothstein's admission that the three companies were the "same thing," there existed a sufficient connection with Virginia to warrant further grand jury investigation.
 
 
 13
 On August 22, 1988 the district court ordered MFR to comply with the records subpoena issued to it. The court found that Model, MFR, and R. Enterprises were one and the same, and that there was evidence that at least one of the entities, Model, had shipped material into the Eastern District of Virginia. Therefore, the lower court reasoned, the material sought from MFR was relevant. The court also found that the subpoenas were not indefinite or burdensome, and that they did not impermissibly chill first amendment rights.
 
 
 14
 On August 18, 1988 the district court found Model, MFR, and R. Enterprises, Inc. in contempt for failure to comply with orders to produce the subpoenaed materials. The court fined each company $500.00 per day, but stayed imposition of the fines until August 22, 1988, pending appeal. This court subsequently stayed the district court's contempt order retroactive to its date of entry, pending this appeal.
 
 II.
 Rule 17(c)
 
 15
 The subpoenas duces tecum challenged in this case were issued pursuant to Fed.R.Crim.Pro. 17(c), which provides:
 
 
 16
 A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit [them] to be inspected by the parties and their attorneys.
 
 
 17
 In United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court held that a subpoena issued pursuant to Rule 17(c) is not "unreasonable or oppressive" if the party seeking its enforcement can demonstrate:
 
 
 18
 (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."
 
 
 19
 418 U.S. at 699-700, 94 S.Ct. at 3103.[2] Against this background, the court concluded, the government, "in order to carry [its] burden, must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." 418 U.S. at 700, 94 S.Ct. at 3103.
 
 
 20
 The determination of whether a subpoena duces tecum issued under Rule 17(c) is either unreasonable or oppressive is "committed to the sound discretion of the trial court." Nixon, supra, at 702, 94 S.Ct. at 3105. Thus, an appellate court will not ordinarily disturb a finding that a subpoena complies with Rule 17(c) unless it determines that the trial court's finding was arbitrary, or without support in the record. Id.
 
 III.
 Business Records Subpoenas
 
 21
 Our only concern with respect to the business records requested from Model, R. Enterprises, and MFR is the relevancy of those documents to the grand jury's investigation.
 
 A. Model Magazine
 
 22
 The grand jury is investigating the possibility that Model shipped obscene materials into, and distributed them within, the Eastern District of Virginia. Such conduct could be found to violate 18 U.S.C. Sec. 1465 (1982)[3], which prohibits the transportation of obscene matters for sale or distribution.
 
 
 23
 We do not doubt the relevance of Model's business records to this investigation, as those records will most likely reveal whether the company's business dealings in Virginia resulted in the sale and or distribution of allegedly obscene materials in the state. Nor do we doubt the necessity of a subpoena to obtain those records, as logically they are available only from the company itself. We therefore affirm the district court's refusal to quash the subpoena requesting Model's corporate records.
 
 B. MFR and R. Enterprises
 
 24
 The government does not allege, and the record contains absolutely no evidence indicating, that either MFR or R. Enterprises has ever shipped materials into, or otherwise conducted business in, the Eastern District of Virginia. The district court found that the business records of these two companies were relevant to the investigation of Model because MFR, R. Enterprises and Model are all owned by the same individual, Martin Rothstein. The lower court apparently believed that Rothstein's ownership of the three companies, in conjunction with the evidence demonstrating that Model shipped allegedly pornographic material into the Eastern District of Virginia, gives rise to an inference that MFR and R. Enterprises also transacted business in that location. In the absence of any evidence linking MFR and R. Enterprises with the Eastern District of Virginia, however, such an inference is arbitrary at best.
 
 
 25
 Rule 17(c) was not intended to provide a means of discovery in addition to that provided by Fed.R.Crim.Pro. 16. See Bowman Dairy Co., supra, 341 U.S. at 221, 71 S.Ct. at 679. In reviewing motions to quash subpoenas issued under 17(c), the federal courts have acted with great care to insure that the rule "is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases." United States v. Cuthbertson, 630 F.2d 139, 146 (3d Cir.1980). The test for enforcement is whether the subpoena constitutes "a good faith effort to obtain identified evidence rather than a general 'fishing expedition' that attempts to use the rule as a discovery device." Id. at 144. See also Bowman Dairy Co., supra, 341 U.S. at 220-21, 71 S.Ct. at 678-79; United States v. Layton, 90 F.R.D. 514, 526 (N.D.Ca.1981).
 
 
 26
 The grand jury's request for these records appears to be premised on nothing more than a hope that the documents will reveal a tie between the companies and Virginia. "Mere hope," however, does not justify the enforcement of a subpoena under Rule 17(c). Cuthbertson, supra, 630 F.2d at 146. See also Gilmore v. United States, 256 F.2d 565, 568 (5th Cir.1958). The government must offer some evidence of a connection between MFR and R. Enterprises and Virginia before it can subpoena the companies' business records under 17(c). Because the government has offered no such evidence, we fail to see how the records of those companies are relevant to a grand jury investigation in the Eastern District of that state. In the absence of such evidence, enforcement of the subpoena would indeed allow the government to engage in a fishing expedition, in the hopes of turning up incriminating evidence.
 
 
 27
 We also note that any evidence concerning Mr. Rothstein's alleged business activities outside of Virginia, or his ownership of companies which distribute allegedly obscene materials outside of Virginia, would most likely be inadmissible on relevancy grounds at any trial that might occur. This is true even if one views the grand jury as investigating Martin Rothstein, rather than Model Magazine. It would appear, therefore, that these subpoenas fail to meet the requirements that any documents subpoenaed under Rule 17(c) must be admissible as evidence at trial. See Nixon supra, 418 U.S. at 700, 94 S.Ct. at 3103.
 
 IV.
 Video Tapes Subpoena
 
 28
 One of the primary concerns voiced by this court in Model I was the lack of specificity in the subpoenas at issue. Rather than requesting specific video tapes, the subpoena required Model to produce any video tapes that met a certain description detailed in the subpoena. We refused to enforce the subpoena because, inter alia, its specificity was "illusory, since the categories described do not refer to particular tapes." Model I, supra, 829 F.2d at 1302. Although the subpoenas before us on this appeal do request the video tapes by title, we cannot find, on the record before us, that they satisfy either the relevancy or necessity requirements of Rule 17(c).
 
 
 29
 The commercial sale or exhibition of films is a form of expression strictly protected by the first amendment. Joseph Burystn, Inc. v. Wilson, 343 U.S. 495, 501-02, 72 S.Ct. 777, 780-81, 96 L.Ed. 1098 (1952). Thus, "the first amendment context of these proceedings heightens the concern about burdensomeness and fourth amendment violations." Model I, supra, 829 F.2d at 1296. Taking these concerns into account in Model I, we quashed the subpoenas duces tecum not only because of their "illusory specificity," but also because "the presumptively protected materials they seek are otherwise procurable, and in a less intrusive manner." Id. at 1302. Such a ruling was required by Nixon, which held that the material sought by a subpoena duces tecum must not be "otherwise procurable reasonably in advance of trial by exercise of due diligence." Nixon, supra, 418 U.S. at 699, 94 S.Ct. at 3103.
 
 
 30
 Model contends that the subpoena duces tecum in this case is invalid because there has been no preliminary determination of whether there is probable cause to believe that the subpoenaed films are obscene. We disagree and reject Model's assertion that a finding of probable cause with respect to each item must precede issuance of a subpoena duces tecum in the context of materials presumptively protected by the First Amendment. No precedent exists for importing the full panoply of Fourth Amendment protections into the area of grand jury subpoenas and indeed to do so would transform this area of law substantially. A subpoena does not present the same kind of potential for intrusion upon the rights of privacy that a forcible search entails, and the resulting safeguards are therefore different. See, e.g., United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (subpoena compelling an individual to appear before grand jury does not constitute a Fourth Amendment "seizure").
 
 
 31
 Rather, we think that Model's protections lie not in the prior review which it seeks but in its own motion to quash. It is open to Model to object to the subpoena duces tecum as being "unreasonable or oppressive." Fed.R.Crim.Proc. 17(c). See In re Grand Jury Subpoena, 829 F.2d at 1305-07 (discussing the requirements for a valid grand jury subpoena). In this regard, if Model moves to quash the subpoena on the grounds that one or more of the films sought is not obscene, the district court must then undertake an in camera review of those films under the relevant legal definition of obscenity. See Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). If, during the course of its review, the court determines that protected films have been sought, the subpoena is invalid and must be quashed in its entirety.
 
 
 32
 We think this safeguard necessary to prevent overbroad subpoenas of films which are clearly protected by the First Amendment. Indiscriminate grand jury subpoenas of protected films could easily convey the impression that erotic or sensual depictions of any sort--including those that are not obscene--open their possessor to criminal prosecution. The fact that a particular film has been subject to subpoena may itself inhibit its display and distribution. The chilling effect of such sweeping and indiscriminate uses of the subpoena power is anything but fanciful; it is altogether real. On the other hand, we see no basis to retard the workings of the grand jury with the kind of burdensome procedures for prior review which appellant requests. Rather, our approach permits a grand jury to investigate criminal obscenity but prevents the grand jury from inhibiting presumptively protected expression which may not be obscene.
 
 
 33
 We also note that there is an additional means for obtaining these tapes other than the issuance of a subpoena duces tecum and an in camera review by the district court. This method would involve simply "buying the tapes and then subjecting them to a determination of obscenity in the eyes of the grand jury or a magistrate before issuing a subpoena duces tecum for particular tapes." Model I, supra, 829 F.2d at 1301. This court is acutely aware that in other pornography investigations the federal government has employed agents to deal in the purchase, sale and distribution of allegedly obscene material. See, e.g., United States v. Guglielmi, 819 F.2d 451 (4th Cir.1987) cert. denied, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988). We fail to see why the government, in this case, refuses to obtain a copy of the requested videos by simply purchasing them.
 
 
 34
 Next, it appears to us that the government failed to establish the relevance of these video tapes to the grand jury investigation. In a case such as this the government "bears the burden of showing in what respect the [items] sought are material to any issue in the case. A mere hope that the [tapes], if produced, would contain evidence favorable to the [prosecution's] case will not suffice." Layton, supra, 90 F.R.D. at 516. See also, United States v. Bookie, 229 F.2d 130 (7th Cir.1956).
 
 
 35
 Having never viewed any of the 193 films in question, the government is unable to allege with any degree of certainty that these presumptively protected materials are in fact obscene. The allegations of the video's obscene nature, and therefore of their relevance, rest solely on the titles of the films.[4] Merely alleging that the title of a film sounds "obscene", without offering a basis for this belief, does not satisfy the relevancy requirement of Rule 17(c). In essence the government is arguing that it cannot know if the material is obscene, and therefore relevant to its case, until it has examined it. By this argument the government is essentially "asking us to allow [them] to use Rule 17 as a device to embark on a 'fishing expedition.' " Layton, supra, 90 F.R.D. at 517.
 
 
 36
 With respect to materials presumptively protected under the first amendment, the government should be prepared to offer more evidence than the title of a work to prove its relevance to a pornography investigation. That evidence could include, but is by no means limited to, descriptions of the film found in the distributor's own promotional material or elsewhere.
 
 
 37
 We are unable to tell from the record what findings, if any, the district court made with respect to the relevancy of the named video tapes to the grand jury's investigation, or the necessity of a subpoena duces tecum as a tool for obtaining those tapes. For this reason we remand to the district court Model's motion to quash the subpoena requesting the movies, so that such findings can be made and incorporated into the record.
 
 
 38
 For the reasons set forth herein, we quash the subpoena duces tecum requesting the business records of R. Enterprises, Inc. and MFR Court Street Books, Inc. and we reverse those companies' convictions for civil contempt. We uphold the subpoena duces tecum requesting certain business records from Model Magazine, and we remand to the district court Model's motion to quash the subpoena duces tecum requesting one copy of each of the 193 named video tapes for findings regarding relevance and necessity.[5] Finally, we reverse Model's contempt conviction based on the company's refusal to turn over the requested tapes.
 
 
 39
 AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.
 
 
 
 [1]
 A subpoena was originally issued to Coast-to-Coast Video, rather than R. Enterprises. The grand jury subsequently issued a subpoena to R. Enterprises d/b/a Coast-to-Coast
 
 
 [2]
 We recognize that the Nixon court was not reviewing a subpoena duces tecum in connection with a grand jury investigation, but we find that its interpretation of Rule 17(c) is equally applicable in this case
 
 
 [3]
 The statute provides in relevant part:
 Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both....
 
 
 [4]
 A random sample of the subpoenaed movies gives us these titles: "Down and Out in New York City", "Wild, Wild West", "Working Girls", "69th Street Vice", "Having It All", "Tickled Pink", "A Little Romance", "Summer Break", "Charm School", and "Wild Things". We fail to see what, if anything, about these titles indicates anything of a sexual nature, much less obscenity
 
 
 [5]
 We again note that the video tapes subpoena was addressed only to Model. No video tapes were requested from either R. Enterprises or MFR